STEVEN KALAR
Federal Public Defender
DANIEL P. BLANK
Senior Litigator
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Daniel_Blank@fd.org

Counsel for Defendant CRUZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No.: CR 19-0453 SI, CR 19-0600 SI |
|---|---|
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | **Court:** **Hon. Susan Illston** |
| YERLIN "GARY" FIDEL CRUZ, | **Date:** February 21, 2020 |
| Defendant. | **Time:** 11:00 a.m. |

**INTRODUCTION**

Defendant Yerlin "Gary" Fidel Cruz-Ortiz promptly demonstrated acceptance of responsibility by pleading guilty to both his new offense of selling $10 worth of crack cocaine to an undercover police officer (CR 19-0453 SI) and for violating his supervised release, subsequently transferred from the District of Arizona (CR 19-600 SI).  Mr. Cruz grew up in extreme poverty in Honduras, where violence has made ordinary life untenable.  In most cases, such a small hand-to-hand drug sale, in the context of this type of upbringing and prompt acceptance of responsibility, would elicit a request from the defense for a sentence of time served.  However, as Mr. Cruz does have a lengthy criminal record (of admittedly minor offenses) reflecting his multiple reentries into the United States and the drug addiction that he acquired here, it is respectfully requested that the Court impose a sentence of 12 months and 1 day on both the new charge and the supervised release violation, to run concurrently.

**BACKGROUND**

Mr. Cruz, 36 years old, was born in a small village in Honduras, to a father who worked in the field and a mother who is disabled due to a stroke. PSR ¶ 53.  Mr. Cruz grew up in the most extreme poverty:  his family did not own its own small farm or even have a house, and instead they "had to live out of boxes."  *Id.* ¶ 54.  He had to leave school in the first grade to help his father in the fields, and so never learned to read or write.  *Id.* ¶ 63.  Mr. Cruz left home at 17 to seek employment in Mexico in order to help support his family, as the violence made it impossible to look for work in Honduras, and after about a year there he then emigrated for the first time to the United States.  *See id.* ¶ 55.[1]

In the United States, Mr. Cruz did find work but also developed an addiction to cocaine. *Id.* ¶¶ 62, 64.  This addiction, coupled with the ongoing need to support his family financially, led to a vicious cycle of small-scale criminal conduct, short periods of incarceration, deportation to Honduras and subsequent illegal reentry back into the United States.  *Id.* ¶¶ 25-

---

[1] Due to gangs, Honduras has become one of the most violent countries in the world.  *See, e.g.,* Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america).

1  36, 40-41, 43-51.  Nevertheless, Mr. Cruz is looking forward to returning to his previous life of
2  sobriety upon his release from custody in the instant offense so he can remain with and support
3  his wife and children in Honduras.  *Id.* ¶¶ 56, 62.

**ARGUMENT**

Mr. Cruz agrees with the calculation of the U.S. Probation Officer that the applicable advisory U.S. Sentencing Guideline range for the new case is 21 to 27 months, based upon Offense Level 10 and Criminal History Category V. PSR ¶ 69.  He also agrees that the advisory guideline range for the revocation is 12 to 18 months, and that the Court has the discretion to run the sentences concurrently or consecutively.  *Id.* ¶ 35.

Under the factors of 18 U.S.C. § 3553(a), Mr. Cruz respectfully requests that the Court vary downward from the low end of the advisory guideline range to a sentence of 12 months and 1 day due to his extraordinary acceptance of responsibility, both in terms of his prompt guilty pleas, as well as due to the dangerous conditions in Honduras which led Mr. Cruz to seek employment here in the United States and to which he will he inevitably be returned.  As noted in the Background section above, Mr. Cruz first emigrated from Honduras because the extreme poverty and violence eliminated any realistic opportunity of gainful employment there.  Once here, Mr. Cruz did find work, but he also developed a drug addiction.  Although the situation in Honduras does not excuse Mr. Cruz's criminal conduct, it does provide an important context, especially when considering the role in creating those violent conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world.  *See* Honduras 2018 Crime & Safety Report, OVERSEAS SECURITY ADVISORY COUNCIL (available at https://www.osac.gov/Pages/ContentReportDetails.aspx?cid =23798) [hereinafter 2018 Crime & Safety Report]; *see also* Gangs in Honduras, INSIGHT CRIME (available at https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf) [hereinafter Gangs in Honduras] at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war.").  Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world.

2

Central America Refugee Crisis, UNITED NATIONS REFUGEE AGENCY (available at https://www.unrefugees.org/emergencies/central-america/); *see also* Gangs in Honduras at 1. According to the 2017 State Department Human Rights Report, violence in Honduras includes "murder, extortion, kidnapping, torture, human trafficking, intimidation, and other threats . . . ." Country Report of Human Rights Practices for 2017, Honduras, U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR (available at https://www.state.gov/documents/organization/277585.pdf) at 1.

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador, also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., Crime and Violence in Central America's Northern Triangle, WILSON CTR RPT. ON AMERICAS (available at https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf [hereinafter Crime and Violence] at 1-2. In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran presidential election came under question as many organizations noticed irregularities with the results. *See* Central America's Violent Northern Triangle; *see also* Honduras: Guarantee Credibility of Elections, Protect Free Expression, HUMAN RIGHTS WATCH (Dec. 2017) (available at https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-expression). Because of the instability and unrest within Honduras, the United States has issued warnings cautioning travel there since 2012. *See* 2018 Crime & Safety Report. These travel warnings are indicative of the safety concerns in the country and why many are fleeing in hopes of creating more sustainable lives.

1	Gang violence is also responsible for the violence throughout Honduras.  Since the
2	1990's, the United States has played a significant role in Honduran gang culture.  *See* Gangs in
3	Honduras at 1.  Mara Salvatrucha (MS-13), the 18th Street gang (M-18), and Barrio 18, three
4	gangs that originated in Los Angeles, are now three of the most prevalent gangs in the country.
5	*See* Clare Ribando Seelke, Gangs in Central America, CONG. RES. SER., 3 (Aug. 29, 2016)
6	(available at https://fas.org/sgp/crs/row/RL34112.pdf); *see also* Gangs in Honduras at 1.  These
7	gangs expanded into Honduras after the United States passed legislation in 1996 that led to the
8	deportation of many undocumented immigrants with criminal records.  *See* Gangs in Honduras
9	at 1.  Although sources vary as to how many gang members are currently active, estimates
10	range between 5,000 to 36,000 members.  *Id.* at 7.  These U.S.-based gangs, along with local
11	gangs, use extortion and violence to control territories and comminutes.  *See* Crime and
12	Violence at 1-2; *see also* Rocio Cara Labrador & Danielle Renwick, Central America's Violent
13	Northern Triangle, COUNCIL ON FOREIGN REL. (June 26, 2018) (available at
14	https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle) [hereinafter
15	Central America's Violent Northern Triangle].  As a result, life in Honduras is tenuous, and
16	violence is a primary reason why many people like Mr. Cruz must flee the country in order to
17	find a life where they can be safe and find economic opportunity.  *See* Central America's
18	Violent Northern Triangle.
19	Despite these dangers in the country to which he will certainly be deported following
20	the resolution of the instant case, Mr. Cruz promptly pleaded guilty, demonstrating
21	extraordinary acceptance of responsibility.  The extreme poverty and complete denial of any
22	educational opportunities which characterized Mr. Cruz's upbringing have presented serious
23	challenges for him, as has the ready availability of narcotics where he was able to find the work
24	he needed to support his family financially.  Nevertheless, Mr. Cruz is looking forward to
25	returning to his previous life of sobriety upon his release from custody in the instant offense so
26	he can remain with and support his wife and children in Honduras.  Based upon this
27	combination of factors, a downward variance on the new case to 12 months and 1 day is
28	warranted under the factors of 18 U.S.C. § 3553(a) and for the same reasons that sentence

should run concurrently with an equivalent sentence of 12 months and 1 day on the supervised release violation.

## CONCLUSION

For the aforementioned reasons, the Court should sentence Mr. Cruz to a term of imprisonment of 12 months and 1 day.

Respectfully submitted,

Dated:   February 14, 2020

STEVEN KALAR
Federal Public Defender
Northern District of California

　　　　　　　/S
DANIEL P. BLANK
Assistant Federal Public Defender